Filed 9/5/25  In re H.H. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re H.H. et al., Persons Coming Under the Juvenile Court Law. | B342325 (Los Angeles County Super. Ct. No. 21CCJP05121A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. B.H., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Juan M. Valles, Judge Pro Tempore.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, B.H. (mother) challenges two juvenile court orders. First, mother argues the court erred when it denied her Welfare and Institutions Code section 388 petition, through which she sought to reinstate reunification services.[1] Second, mother argues the court should not have terminated her parental rights to her two young children because the beneficial parental relationship exception to adoption applied. We find no error and affirm.

## BACKGROUND

### 1.    The Family

Mother has two children, one son and one daughter. Her son H.H. (son) was almost five years old when the underlying proceedings began. Son is autistic. His father pays child support but otherwise has not been involved in son's life and is not involved in this appeal. Mother has sole legal and physical custody of son.

Mother's daughter E.H. (daughter) was 10 months old when the underlying proceedings began. Daughter's father is M.P., who was involved in the underlying proceedings but is not a

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

party to this appeal. Mother and M.P. had a tumultuous relationship, rife with domestic violence.

Mother has a history of drug use. Mother admitted that, before she was pregnant with son, her "drug of choice was cocaine." Son's father said mother used drugs years ago when they were together, but he did not know what kind.

## 2. Petition, Adjudication, Disposition and Placement

The underlying proceedings began in November 2021, when the Los Angeles County Department of Children and Family Services (Department) filed a section 300 petition on behalf of son and daughter (petition). The petition alleged son and daughter were at risk due to M.P.'s domestic violence against mother, M.P.'s substance abuse, and mother's failure to protect the children from either the domestic violence or M.P.'s substance abuse. The petition also noted mother and M.P. had violated criminal protective orders protecting mother from M.P and daughter's half sibling had received permanent placement services due to M.P.'s substance abuse. Initially, the children remained in mother's care under Department supervision.

In early January 2022, the juvenile court sustained the petition as pleaded. Due to mother's uncooperative and unsafe behavior—including taking the children out of state against court orders and continuing to see and be abused by M.P. with the children present—the court detained the children from mother and ordered monitored visitation. However, mother refused to reveal where the children were located, resulting in the issuance of a protective custody warrant for the children and an arrest warrant for mother. Soon after, mother brought the children to a maternal aunt's home, the warrants were recalled, and the children were placed with the maternal aunt.

3

At the disposition hearing held in late January 2022, the juvenile court declared the children dependents of the court and removed them from mother's custody and care. The court ordered mother to participate in and complete family reunification services, including a 26-week domestic violence support group for victims, a parenting program, individual counseling, and six consecutive clean drug tests. If mother missed a drug test or tested positive for a controlled substance, she was ordered to complete a full drug rehabilitation program with random testing. The court also ordered mother to comply with the two then-active criminal protective orders. The court granted mother monitored three-hour visits with the children three times a week.

The maternal aunt with whom the children initially had been placed could not continue to care for them. Eventually, in May 2022, after one other placement, the children were placed in the home of Mr. and Ms. S. (caregivers), with whom the children stayed for the remainer of the proceedings.

3.    **Reunification Period**

    a.    **Mother**

Mother continued to see and maintain contact with M.P. Eventually, however, mother stopped seeing him.

Although mother completed most of her court-ordered programs, she struggled with her drug testing and substance abuse program requirements. Early in the reunification period, mother stated she did not use drugs; however, she consistently either tested positive for marijuana or failed to appear for her drug tests. Consequently, in May 2022, mother enrolled in a substance abuse rehabilitation program. Mother continued to miss tests and to test positive for marijuana. In July or August 2022, mother tested positive for cocaine. In March 2023, mother

4

stated she had stopped using marijuana and was testing negative in her drug rehabilitation program. Test results from her program, however, revealed mother continued to test positive for marijuana. By May 2023, mother began showing negative test results. In June 2023, however, mother tested positive for alcohol and, for her next scheduled drug test, failed to show.

Mother had been prescribed anxiety medication but she preferred using marijuana to treat her anxiety because she did not like the side effects of her prescription medication. She said she used marijuana only at night and would not use it near the children. Mother had a medical marijuana card.

Throughout the underlying proceedings, mother struggled to comport herself around Department social workers and others involved in her family's case. Mother was described as, for example, "difficult," "persistent," "confrontational," "very loud," having "difficulty managing her emotion," and "aggressive." At times, mother cursed and yelled at Department social workers and accused them of "sabotaging" her case. Nonetheless, on several occasions, the Department commended mother for her receptiveness to and active participation in reunification services, her consistent visitation with the children, and her reduction over time of marijuana use.

During the last few months of the reunification period, however, mother's obstreperous behavior intensified. In April 2023, caregivers and the children's daycare provider reported mother called and texted them excessively and overstepped boundaries. During visits, mother was argumentative with Department monitors as well as with other families in the area.

### b.    Children

The Department consistently reported mother and the children had a strong bond.  More than one year into the reunification period, the Department stated, "There is no doubt that the children love their mother and are eager to be back in her care."  Daughter cried "for mother after visitations" and "at every visit," son "expresses that he wants to go back home with mother."  By July 2023, son told a Department social worker he would like mother to live with him at caregivers' home "so they can all be one family."  When told that was not possible, however, son stated he "prefers to live in his current placement with [caregivers] because he feels safe and he would miss them if he were to leave."

Throughout the reunification period, the Department reported the children were thriving with caregivers and were bonded to them.  Caregivers wanted to adopt the children if they were unable to reunify with mother.

### c.    Visits

Mother visited consistently with the children.  For the most part, mother was appropriate, loving, and actively engaged with the children.  At times, however, caregivers expressed frustration when son's behavior regressed following some visits.  Caregivers believed mother undermined their efforts to maintain routines and consistency for son.

In September 2022, the juvenile court gave the Department discretion to liberalize mother's visits to unmonitored.  Days later, however, due to concerns with mother's cocaine-positive drug test, the Department requested her visits return to monitored.  In November 2022, the juvenile court granted the Department's request and ordered mother's visits to be

monitored.[2] Mother's visits remained monitored throughout the remainder of the underlying proceedings.

Although by the end of the reunification period mother continued to visit the children regularly, her behavior during visits had become problematic. The Department reported mother struggled to supervise both children during visits and was unreceptive to monitors' and social workers' suggestions and warnings as to keeping the children safe. During one visit, for example, son was out of mother's sight, fell, bit his tongue and required an emergency room visit. The attending doctor instructed mother not to give son solid food for 24 hours while his tongue healed. However, minutes later, mother gave son pizza to eat. Son took a bite and "began crying hysterically in pain." By June 2023, the Department began assigning two monitors for mother's visits.

### d. Termination of Family Reunification Services

Beginning in February 2023, and for months after, the Department recommended mother's reunification services be terminated. The Department noted, although mother had completed many of her court-ordered services, she was not taking responsibility for her actions, continued to minimize both her behaviors and drug use, and was displaying "controlling and defensive like behaviors." The Department did not believe mother was "utilizing the tools and resources that were taught in her Court ordered programs" or that she had "mitigated the concerns that brought her" to the Department's attention. Given the children's young ages and son's autism, the Department

---

[2] Mother appealed this ruling (B326090). Her appeal was dismissed as abandoned pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835.

remained "concerned that mother has not fully demonstrated the abilities to keep the children safe while being able to tend to their needs."

Despite the Department's recommendations, however, the juvenile court extended mother's reunification services into August 2023. In total, mother's reunification period spanned 18 months, from February 1, 2022, to August 2, 2023. On August 2, 2023, after hearing testimony from mother and a Department social worker, the juvenile court terminated mother's reunification services and scheduled a permanency planning hearing for November 2023. The court found "Mother's testimony was wholly not credible at all." The court held there was no reason to further continue mother's reunification services, noting, "The court can order services until the break of dawn, but unless the mother accepts accountability, shows insight, it is for [naught]." The court held mother's "erratic and impulsive behavior, and [her] lack of insight, truly places these children at risk of substantial harm to their physical and emotional well-being."

## 4.    Permanency Planning and Review Period

After several continuances totaling one year, the permanency planning hearing was held in November 2024. Prior to that time, the Department submitted numerous reports to the court addressing, among other things, mother's visits with the children, the children's placement with caregivers, and the status of mother's drug testing.

### a.    Visits

Mother continued to visit the children regularly. The children generally enjoyed visits and were excited to see mother. Increasingly, however, the children seemed to prefer playing

video games on mother's phone than spending time with mother. In November 2023, the Department reported the children had been "acting up" at home and at school. Caregivers believed the negative behavior stemmed from mother allowing the children to play on her phone for extended periods during visits. Eventually, due to excessive usage and behavior issues, the Department banned electronics during visits. When electronics were no longer allowed, son no longer wanted to attend visits.

The ban on electronics also impacted mother's willingness to help son with his homework. She had used her phone to motivate son, but once electronics were banned, she no longer helped with homework, even when son wanted to do it. Son struggled to keep up with schoolwork because, once he returned to caregivers' home after visits, it was time to get ready for bed.

According to the Department, the children did not have "separation anxiety" when visits ended. The Department believed the children were "more sad when leaving [visits] because they were having fun playing, meaning they didn't want to stop what they were doing, and not because they were leaving mother." The Department also reported that, by November 2023, the children were not interested or engaged in telephone visits with mother.

Mother continued to display the same troubling behaviors during visits. Mother struggled to supervise the children, remained unreceptive to feedback, and was defensive, aggressive and impulsive both with Department personnel as well as with other people in the area. In October 2023, at the Department's request due to concerns with mother's behavior, the juvenile court ordered mother's visits to take place at a Department office. The court admonished mother "to abide by the visitation

9

guidelines and refrain from being disruptive during visits." In violation of court orders, mother spoke with son about the case and repeatedly indicated he would be home with her soon. Mother also made excuses for son based on his autism, which son started to do as well. For example, son stated, " 'I'm autistic so I can't read good,' " and insisted he should be allowed to use mother's phone because he was autistic. To the contrary, caregivers and son's teachers believed he was quite capable with proper supports.

### b. Placement

The children continued to thrive with caregivers, who maintained their desire to adopt the children if they were unable to reunify with mother. The children were "very well bonded" with caregivers, whom they called " 'mommy' " and " 'daddy.' " By November 2023, the children would "excitedly run towards the caregivers" after visits with mother. The children sought out the caregivers for comfort. In November 2023, the Department reported son "prefers to live in his current home [with caregivers] because he feels safe and he would miss [caregivers] if he were to leave." However, son also stated he enjoyed visits with mother and "would like [her] to maybe live with him in the home of [caregivers]."

### c. Drug Testing

Following the termination of mother's reunification services, the Department no longer required mother to drug test. However, mother continued to test through her substance abuse program, in which she continued to participate.

In February 2024, the Department reported it had received information mother "nearly overdosed" two months earlier. A Department social worker who previously had worked on

mother's case "received a random message" from an unknown number that said, " '[Mother] came over to my house and told me that she overdosed on drugs two months ago.' " The social worker tried to gather additional information by contacting the same phone number. The only information received in response was: " 'I'm sorry for anything that was given out to you through my phone. You know what, idk [I don't know] what was said to you but it wasn't by me [A.H.] I haven't talked to [mother] in a very long time.' " Eventually, the Department determined the phone number belonged to one of mother's sisters.

Mother explained her sister had " 'a lot of anger towards me' " and wanted " 'to do whatever it takes for me to not get my children back.' " Mother stated she continued to test for her substance abuse program, which she completed on March 1, 2024. She said she attended Alcoholics Anonymous (AA) meetings and had a sponsor. Neither mother's sponsor nor her substance abuse program coordinator suspected mother had relapsed. According to mother, her sister admitted to lying about mother's alleged overdose.

## 5.    Mother's Section 388 Petition

In March 2024, mother filed a section 388 petition asking the juvenile court to change its August 2023 order terminating family reunification services (388 petition). Mother requested a new order either returning the children to her care, or reinstating family reunification services with unmonitored visits. Mother stated that, since the court's earlier order, she had complied with and adhered to her case plan, completed domestic violence classes, and completed an outpatient substance abuse program. Mother also stated she continued drug testing, attended AA meetings, had an AA sponsor and a clean home with a safe yard,

11

and continued to visit consistently with the children. In a supporting declaration, mother acknowledged she had "a drug dependency issue." She stated she completed "a substance abuse treatment program on March 1, 2024" and her "sobriety date is August 8, 2023." She denied recent reports that she had overdosed, stating she had tested negative and never missed a weekly test since August 8, 2023. She stated she had "gained the insight necessary to see how my past choices and addictions led me to be in a situation that was not safe for myself or my children." Mother believed the requested change was in the children's best interests.

### a.    Further Department Reports

The hearing on mother's 388 petition was continued several times. The juvenile court eventually held the hearing over the course of several days in October and November 2024. Given the many continuances, the Department submitted additional reports for the court prior to the various hearing dates.

The children were bonded with both mother and caregivers. The Department did not know how the children would feel if visits with mother ended or if their relationship with mother were severed. Son said he was happy with caregivers and daughter hugged them "without hesitation." Son stated he preferred to live with caregivers because he felt safe there and would miss caregivers if he were to leave.

Mother remained involved in her drug rehabilitation program, participated in an outpatient program and aftercare, and attended weekly AA meetings and monthly individual counseling. Her substance abuse counselor stated mother continued "to show a tremendous amount of growth." Mother was learning to take responsibility for her actions. She admitted

she had been "very mean" to a Department social worker and, early on in her case, "she was in her addiction, on the defense, and not open to change." Mother reported she had been sober for one year and identified May 4, 2023, as her sobriety date. Between the end of May and early August 2024, mother had 15 negative drug tests.

Mother continued to visit the children consistently and the children enjoyed their visits. After cell phones were banned from visits, son's negative behaviors decreased. Mother was attentive and able to comfort the children when needed. The Department reported son "appears to view [mother] as both as a friend and a parent." The Department opined the children were sad— sometimes daughter cried—at the conclusion of visits because they were no longer able to play. During a July 2024 visit, son was upset because he could not have ice cream and had to stay near daughter. Son said, " 'I want to cut my time! I want to go home to [caregivers]' " and " 'I want to be with [caregivers].' "

Between August and October 2023, the Department continued to report mother struggled to supervise both children during visits and discussed the case with the children in violation of court orders. Mother made false claims against, and acted "combative" toward, Department staff. Consequently, Department staff did not want to monitor mother's visits. Despite the "no electronics" rule, mother sometimes allowed the children to use her phone during visits, which resulted in the children displaying negative behaviors such as tantrums and defiance. During an October 2024 visit, son accidentally hit daughter's head with a door when he tried to scare mother and daughter. Daughter was taken to urgent care.

### b.	Testimony

During the hearing on mother's 388 petition, the court heard testimony from Sandy Sandoval (a Department social worker), Kamron Hightower (a social worker with the law firm representing mother), and mother.

Ms. Sandoval reiterated what the Department previously reported. Although mother had completed her court-ordered programs, Ms. Sandoval had not seen mother implement skills learned in those classes during visits with the children. Ms. Sandoval believed this put the children at risk.

Ms. Hightower testified she observed five visits between mother and the children. Ms. Hightower stated mother communicated well with her children, including when they were upset or needed redirection. She described visits with no safety concerns and no help needed from monitors. Ms. Hightower never saw mother engage in unsafe or inappropriate behavior with the children or struggle to take care of the children. Ms. Hightower testified mother was able to set boundaries and was "[v]ery active and engaged" with the children. Ms. Hightower said the children called mother "mom" and were "very attached to their mom. When they see her, they run to her. They hug and kiss her." Ms. Hightower had seen daughter cry at the end of visits when mother had to leave. Ms. Hightower testified mother was "assertive" and "a self-advocate," which "could come off a bit aggressive." She witnessed mother being aggressive and confrontational, but never in front of the children. Ms. Hightower believed the Department had abused its power by "not provid[ing] sufficient transparency to mother" and by having different monitors giving mother different rules to follow during visits.

14

Mother testified she was no longer in a relationship with M.P. and had no intention of being in one. She completed her domestic violence class, parenting class, and individual counseling in March 2023. Mother testified she learned in her domestic violence class how to communicate properly, including that "getting aggressive is not a solution, but there's better ways to deal with issues." In her parenting class, she learned about appropriate discipline, including for children with disabilities, effective communication with her children, and being proactive in asking for support. She testified she learned about supervising her children as well as, from a parenting perspective, the importance of remaining sober and not engaging in domestic violence.

Mother also addressed her substance abuse, stating she found support in her AA sponsor and meetings as well as through art therapy. Mother testified she had been sober for 540 days, since June 2022, and continued to test weekly. Later, however, she corrected herself saying she had been sober 511 days, since June 2023. She could not remember the exact date in June 2023 and said she was counting from June 1. Later counsel reminded mother she had tested positive for alcohol on June 23, 2023. She said she was "not very good with dates" but remembered her last positive test result was in June 2023. Additionally, mother testified the discrepancy between the August 8, 2023 sobriety date listed in her section 388 petition and the June 2023 date she testified to in court was "[p]robably because [the August date was] when I started my AA program." Mother did not remember telling a social worker that her sobriety date was May 4, 2023. She said it had been a couple of years since she missed a drug test.

Mother explained that, in order to complete the 90-day drug treatment outpatient program, "You test three times a week until you get your 90-days completed." Mother agreed that if she tested positive for any substances, her sobriety date would reset to her next clean test. Mother testified she started her substance abuse program in March 2022 and completed it two years later in March 2024. Mother explained why it took her two years to complete a 90-day program: "You have to stay sober for 90 days to get your certificate of completion, and I was testing positive for subsistence [*sic*]. I still continued to go, though, because I wasn't willing to give up on my sobriety, and I still kept trying and trying." After completing the 90-day program, mother completed a five-month aftercare program and enrolled in AA.

Mother testified the children were excited to see her, hugged and kissed her, wanted to play with her, and called her "Mommy." She said sometimes they cried when visits ended, sometimes son had to be physically carried away, and sometimes daughter begged to stay with mother. She agreed with the Department's decision to ban electronics during visits because they had become a problem for son. Mother explained how she communicated with, disciplined, and set boundaries for the children during visits. She talked about son's autism and how she handled some of his behaviors and the support she and he used to get from the regional center. She testified she never refused to help son with his homework during visits. To the contrary, she said she helped him with homework at every visit. Mother denied talking to the children about the case or that monitors had to redirect her during visits. Mother testified the Department did not communicate well with her and she often was unaware of Department concerns or the children's doctor's

appointments.  Mother also stated having different monitors for visits caused problems and was confusing.  She testified she did not know why her visits remained monitored, although she agreed she may have played a part in that.

### c.    Argument

Following testimony, counsel for mother urged the juvenile court to grant mother's 388 petition.  Counsel argued there were changed circumstances because mother had complied with her case plan, specifically completing her substance abuse program, and the requested change was in the children's best interests.  Counsel believed the Department was biased against mother, had "mischaracterized" her, and made things difficult by assigning different monitors with different rules for visits.  Counsel said mother was "a loving mother who is committed to her children's needs" and it was "amazing that mother through all this adversary with [the Department] has not given up.  Given all the hurdles and pushback she's received from [the Department].  Mother has been patiently waiting for the return of her children."

Counsel for the children urged the juvenile court to deny mother's 388 petition.  Counsel argued mother had shown neither changed circumstances (as she was "in the early stages of maintaining a sober lifestyle" and had not shown insight) nor that the requested modification was in the children's best interests (as the children had been in a stable placement for over two years and mother seemed not to understand basic parenting responsibilities).  Counsel noted, "Any parent can go through the motion and complete courses, but the key goal of the case plan is for the parent to gain insight to ensure they can provide the care needed for their child.  [Mother] has unfortunately not yet provided any evidence of gaining insight."

17

Counsel for the Department similarly asked the court to deny mother's 388 petition. Counsel argued mother was "essentially in the same position" as she was in August 2023, when the court terminated mother's reunification services. Counsel stated mother had neither gained insight nor taken accountability for her actions. Counsel argued mother's testimony was not credible "as a whole" and specifically on issues such as the children's phone usage, son's homework, her own troubling behaviors, and her sobriety date. The Department's "prominent concern" was that "mother is unable to adequately supervise both children." Counsel also argued mother had not shown the requested modification was in the children's best interests.

### d. Ruling

On November 25, 2024, the juvenile court denied mother's 388 petition. The court concluded, rather than demonstrating a substantial and material change in circumstances, mother had shown only her circumstances were changing. The court found it significant that mother took two years to complete a 90-day substance abuse program and had testified that "the 90-day clock reset every time a client produces a positive test." The court stated, "Without any other explanation, the court is left with only one conclusion as to why it took mother two years to complete a three-month program. She must have tested positive." The court concluded, "If mother graduated in early March 2024, she must have tested positive in early December 2023. The court is befuddled as to why an alternative explanation was not proffered. . . . Mother did not testify as to any other reason why the last reset date would have been in December 2023. Nothing in the reports provide a contradictory explanation, and nothing in

18

evidence reconciles this issue." As support for its conclusion, the court pointed to the maternal aunt's February 2024 text stating mother had overdosed two months earlier. The court stated, "Alone, this message would have been unpersuasive. However, it does point to the possibility that mother did indeed relapse in December 2023." The court reserved its discussion of best interests for the permanency planning hearing, to which it immediately turned.

**6.     Permanency Planning Hearing**

During the permanency planning portion of the hearing, counsel for the Department urged the juvenile court to terminate parental rights. Counsel argued no exception to adoption, including the beneficial parental relationship exception, applied. Counsel stated the children had "no positive, significant emotional attachment" to mother such that terminating parental rights would be detrimental to them. The Department believed the children's relationship with mother, while a positive one, was "akin to a friend or a relative, but most definitely not akin to a parent-child bond." Counsel for the children agreed with the Department's position. On the other hand, counsel for mother urged the court to apply the beneficial parental relationship exception to adoption. Counsel argued mother had met all three elements required for the exception to apply. Mother's counsel asked the court to order legal guardianship.

After hearing argument, the court found the children were adoptable and no exception to adoption applied. With respect to the beneficial parental relationship exception, the court found mother was, "at best," "a friendly visitor" and she had not shown that maintaining her relationship with the children outweighed the benefits of permanency through adoption. Accordingly, the

19

court terminated parental rights to the children and designated caregivers as their prospective adoptive parents.

**7.    Appeal**

Mother appealed the juvenile court's November 25, 2024 orders denying her 388 petition and terminating parental rights.

**DISCUSSION**

**1.    Section 388 Petition**

As noted above, through her 388 petition, mother requested an order either returning the children to her care or reopening family reunification with unmonitored visits.  Mother argues the court erred when it denied her 388 petition.  We disagree.

**a.    Applicable Law**

A parent of a dependent child may seek modification of an order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1).)  "[T]he parent must sufficiently allege *both* a change in circumstance or new evidence *and* the promotion of the child's best interests."  (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157.)  The parent must show a "genuine change of circumstances" and not merely changing circumstances.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Thus, "after reunification services have terminated, a parent's [section 388] petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)  "A court hearing a motion

20

for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.)

### b. Standard of Review

We cannot disturb the juvenile court's decision on mother's 388 petition "unless an abuse of discretion is clearly established." (*In re Stephanie M., supra,* 7 Cal.4th at p. 318.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at pp. 318–319.) A court exceeds the limits of discretion if its determination is arbitrary, capricious, or patently absurd. (*Id.* at p. 318.)

### c. The juvenile court did not abuse its discretion in denying mother's 388 petition.

The juvenile court correctly found mother's circumstances since August 2023 had not substantially changed. Although mother claimed various dates as her sobriety date, the latest date she gave was August 8, 2023. As the juvenile court noted, however, mother completed her 90-day substance abuse program in March 2024, two years after enrolling in the program. Therefore, relying on mother's own testimony, the court determined mother's 90-days of sobriety began sometime in December 2023, not August, June, or May 2023. Although mother claims this was improper speculation, we disagree. Mother testified the completion date for her substance abuse program was calculated by counting 90 days after she began consistently testing negative—i.e., 90 days from her sobriety

date.  If she tested positive at any point, her sobriety date would reset and the 90 days would start over.  Indeed, in explaining why it took her two years to complete the program, mother testified, "I was testing positive for subsistence [*sic*]."  No one gave an alternative explanation for how mother's substance abuse program completion date was calculated.  Although not necessary to the court's decision, the somewhat mysterious text message alerting a Department social worker to mother's alleged overdose in December 2023 lends support to the court's analysis.  Thus, the record supports the court's finding that when mother filed her 388 petition, she had been sober for approximately three months.

In addition to her sobriety and completion of her substance abuse program, mother also listed as changed circumstances her participation in AA and aftercare, adherence to her court-ordered programs, and safety improvements to her home.  She stated she had gained necessary insight, had learned how to communicate properly, and there were "better ways to deal with issues" than "getting aggressive."  While we certainly commend mother not only for her sobriety but also for the steps taken to maintain her sobriety, she only recently had begun her sober living.  Additionally, although mother believed otherwise, the record supports a finding that mother continued to display aggressive and combative behavior and had not gained necessary insight, both of which had been constant impediments to her reunifying with the children.  We cannot reweigh the evidence or substitute one reasonable inference for another.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)  Finally, mother's improved home environment was not a significant enough change on its own

because the larger concerns were her addiction and lack of insight.

Given mother's admitted "drug dependency issue," the recentness of her sobriety, and continued lack of insight, it was not an abuse of discretion for the juvenile court to deny her 388 petition based on its determination her circumstances had not substantially changed but were only changing. Because the court found no genuine changed circumstances, it was unnecessary to consider the second prong of the section 388 analysis (i.e., the children's best interests).

## 2. Beneficial Parental Relationship Exception

Mother also argues the order terminating her parental rights must be reversed because the beneficial parental relationship exception to adoption applies. Again, we disagree.

### a. Applicable Law

At the permanency planning hearing, the juvenile court may terminate parental rights only upon finding the child is likely to be adopted and no statutory exception to adoption applies. (§ 366.26, subds. (b) & (c)(1).) Here, it is undisputed the children were likely to be adopted. Thus, our focus is whether a statutory exception to adoption and the termination of parental rights applies.

The exception mother raises is the beneficial parental relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i), which provides: "[T]he court shall terminate parental rights unless . . . [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular

23

visitation and contact with the child and the child would benefit from continuing the relationship."

To establish this exception, the parent must prove the following three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.) The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Id.* at p. 631.)

### b. Standard of Review

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review. On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception]. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination.

It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion. As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' [Citation.] But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Id.* at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a

reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

### c.    No Error

There is no dispute mother satisfied the first element (regular visitation and contact with the children) of the beneficial parental relationship exception.  Although the juvenile court found otherwise, we assume without deciding that mother satisfied the second element (a relationship with the children, the continuation of which would benefit the children).  We conclude, however, the juvenile court did not abuse its discretion in determining mother failed to establish the third element.

As noted above, the third element requires the juvenile court to "decide whether it would be harmful to the child to sever the [parental] relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  The court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)  Although the loss of a parental relationship may cause detriment to a child, the question for the juvenile court is whether the countervailing positives the child gains in a permanent, stable home outweigh any such detriment. (*Ibid.*)  "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633–634.)

Although mother and the children shared a bond and, for the most part, enjoyed their time together, the juvenile court did not abuse its discretion in determining the benefits to the children of adoption by caregivers outweighed any harm the children might experience from severing their relationship with mother. By the time of the November 2024 permanency planning hearing, the children had been in the care of caregivers for two and a half years. Daughter had spent most of her young life, and son had spent half of his life, outside of mother's care. Caregivers undeniably met the children's needs, including son's special needs due to his autism. There is no dispute the children were bonded and thriving with caregivers, who were dedicated to adopting the children. Although initially son stated he wanted to return home with mother, as time went on, he expressed his desire to stay with caregivers. After electronics were banned during visits with mother, son no longer wanted to attend visits. The children also lost interest in telephone visits with mother and did not seek mother when they were away from her. According to the Department, when visits ended, the children did not suffer separation anxiety but were upset because they had to stop playing. Despite her efforts, mother had not progressed past monitored visits. The record supports the juvenile court's finding that mother was, "at best," "a friendly visitor." Although mother disputes these factual characterizations, it is not our role to reweigh the evidence or make credibility determinations. (*Caden C.*, *supra*, 11 Cal.5th at p. 640; *In re I.J.* (2013) 56 Cal.4th 766, 773.)

Contrary to mother's implication, the juvenile court did not engage in "social engineering." As mother correctly notes, when considering the beneficial parental relationship exception to

27

adoption, it is not appropriate to compare mother's and caregivers' parenting styles. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 634.) However, there is no indication the juvenile court determined either that caregivers were better at parenting than mother or that the children should stay with caregivers because of such a comparison. Rather, the juvenile court determined the children simply did not have the type of relationship with mother that, if terminated, would cause the children harm that would outweigh the benefits of an adoptive home.

Mother also argues the juvenile court admitted error when it ordered mother's visits to continue after her parental rights had been terminated. First, mother cites no legal support for her position. Second, at the end of the permanency planning hearing, it was the Department that asked the court to limit mother's visits to once a week. The court said it would "allow" mother to continue her monitored visits once a week at a Department office. It is not clear this is an enforceable order. Regardless, we are not persuaded that it evidences reversible error.

Finally, mother argues we must reverse because the juvenile court failed to conduct "a legally sufficient section 366.26 hearing, focused on factors that are inappropriate under *Caden C.*" Although it is not clear what factors mother finds inappropriate, it is clear the court addressed and appropriately applied *Caden C.* The court explicitly referenced the case more than once and addressed the three *Caden C.* prongs. We find this argument unpersuasive.

Although the juvenile court was faced with a difficult decision, we conclude it was not an abuse of discretion for the court to find the benefits and security of adoption by caregivers outweighed any harm from terminating mother's parental rights

to the children.  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  Thus, the juvenile court did not err when it held the beneficial parental relationship exception to adoption did not apply.

## DISPOSITION

The juvenile court's November 25, 2024 orders are affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.